IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | **NO. A-12-CR-105-SS** |
| | § | |
| HUSSEIN ALI YASSINE | § | |

**APPEAL FROM DETENTION ORDER AND/OR MOTION FOR
<u>RECONSIDERATION OF DETENTION ORDER</u>**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Defendant, HUSSEIN ALI YASSINE (also known as Mike Yassine), by

and through his newly retained counsel of record, David L. Botsford, and pursuant to 18 U.S.C. §§

3142(f) and 3145, presents this his Appeal From Detention Order And/Or Motion For

Reconsideration Of Detention Order, and as grounds therefor, would respectfully show this

Honorable Court the following:

**I.**

**OVERVIEW OF SITUATION**

Defendant Yassine was arrested without incident at his residence in Austin on March 22,

2012.[1] The arrest was pursuant to the return of the instant indictment, which alleges four violations

---

[1] *See* **Exhibit 1** at page 98 [i.e., a transcription of the entire detention hearing held on March 27, 2012 for those defendants whose detention was sought in connection with the coordinated arrests thereof in Cause No. A-12-CR-101, A-12-CR-102, A-12-CR-103, A-12-CR-104, and A-12-CR-105]. The actual detention hearing for Defendant Yassine is contained at pages 88 to 107, although testimony adduced during the other defendants' detention hearings appears to have been considered by the U.S. Magistrate Judge as to Defendant Yassine. *See also* page 1 of the U.S. Pretrial Services Report (i.e., the first second sentence of the "Introduction"). Pursuant to 18 U.S.C. § 3153(c)(1), the report of U.S. Pretrial Services is **not** attached hereto since it is confidential and would otherwise be available to the Court. However, it is incorporated herein by reference for purposes of brevity.

1

of 18 U.S.C. § 1956 against Defendant Yassine.[2] On the day of his arrest and prior to his initial appearance that same day, *see* **DOC #16**, the Government moved to detain Defendant Yassine because he posed a serious risk of flight. *See* **DOC #12**. The United States Magistrate Judge temporarily detained Defendant Yassine based on the Government's motion. *See* **DOC #18**.

On March 27, 2012, a detention hearing was held before U.S. Magistrate Judge Dennis Green. Defendant was represented by David Sheppard.[3]  Although the report and recommendation of the United States Pretrial Services Office reflected a recommendation of release on a combination of conditions,[4] the U.S. Magistrate Judge detained Defendant. The written order of detention states the following:

> There is a serious risk that the defendant will not appear. The defendant is not a citizen of the United States and is not lawfully admitted for permanent residence. The defendant is facing serious charges involving drug trafficking and substantial sums of money. The defendant is a permanent resident alien with an incentive to flee as it is inconceivable immigration officials will not move to revoke his residence should [h]e be convi[c]ted of the instant charges. The defendant also has significant ties to another country.
>
> There is a serious risk that the defendant will endanger the safety of another person or the community. The defendant is accused of drug related offenses and involvement in a substantial criminal conspiracy.

*See* **DOC #36**.

As noted above in footnote 1, a copy of the entire detention hearing of all of the defendants

---

[2] With the exception of count 2, Defendant Yassine is indicted in all of the counts in the indictment.

[3] Due to Mr. Sheppard's personal situation, Mr. Sheppard decided that he should withdraw from the case and he referred Defendant Yassine to undersigned counsel. Undersigned counsel entered his appearance in this case on April 14, 2012. *See* **DOC #64**.

[4] *See* pages 3 to 4 of the report of U.S. Pretrial Services for the recommended combination of conditions.

is attached hereto as **Exhibit 1** for the Court's convenience. The actual detention hearing for Defendant Yassine is contained at pages 88 to 107.

Defendant hereby appeals the U.S. Magistrate's detention order and/or seeks reconsideration of that order from the District Court. In summary, this appeal/reconsideration is respectfully submitted because:

(1) the order of detention finding "a serious risk that the defendant will not appear" is not supported by a preponderance of the credible evidence[5] **both** that the Defendant presents a risk of flight **and** that no condition or combination of conditions can be imposed reasonably to assure his required attendance, as mandated by 18 U.S.C. § 3142;

(2) the order of detention finding "a serious risk that the defendant will endanger the safety of another person or the community" is not supported by clear and convincing evidence,[6] let alone sufficient evidence to demonstrate that no condition or combination of conditions can be imposed reasonably to assure the safety of other persons or the community, as mandated by 18 U.S.C. § 3142(f); and

(3) there is new information developed by undersigned counsel which was not previously known and available to Mr. Sheppard (given the very short period of time between his retention and the detention hearing) and Defendant Yassine that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of the Defendant and the safety of any other person and the community.

Defendant Yassine respectfully asserts that given the factors which are required to be

---

[5] Since, as explained below, there is no statutory presumption, it was the Government's burden at the detention hearing to prove beyond a preponderance of the evidence **both** that the defendant presents a risk of flight **and** that no condition or combination of conditions can be imposed reasonably to assure his required attendance under 18 U.S.C. § 3142(e). *See United States v. Fortna*, 769 F.2d 243, 250-251 (5th Cir. 1985); *United States v. Ibarra*, 770 F. Supp. 337 (S.D. Tex. 1991), reversed, 966 F.2d 1447 (5th Cir. 1991). In other words, the Government was required prove risk of flight by a preponderance of evidence, establishing that it was more likely than not that no condition or combination of conditions would reasonably assure Defendant Yassine's appearance.

[6] *See United States v. Fortna*, *supra*; *United States v. Ibarra*, *supra*.

considered -- those listed in 18 U.S.C. § 3142(g)[7] -- the following combination of conditions [or the "least restrictive" conditions envisioned by the Court, as mandated by § 3142(c)(1)(B)] can reasonably assure his appearance and the safety of any person and the community:

(1) Bond in an amount appropriate from the Court's perspective, given the fact that the Federal and State governments have frozen and/or seized substantial amounts of money (as further discussed below);

(2) GPS and/or voice track electronic monitoring;

(3) Geographical restrictions on his travel, limiting him to the 78701 zip code (downtown Austin, where he lives, has an office and where undersigned counsel's office is located);

(4) Restricting the Defendant to his residence at 555 W. 5th, Apartment 3121, Austin,

---

[7] 18 U.S.C. § 3142(g) states that the "judicial officer shall" ..."take into account the available information concerning --"

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including --

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release....

Texas, 78701;[8] and/or

(5) If deemed absolutely essential from the Court's perspective, the retention of off-duty law enforcement officers (24 hours, 7 days a week, with the cost to be borne by the Defendant) to guard the Defendant if he were to be restricted to his residence at 555 W. 5th Street, Apartment 3121.[9]

## II.

## FACTS AND ARGUMENT FOR APPEAL/RECONSIDERATION

### A. The Indictment Allegations And The Potential Punishment Does Not Justify Detention.

The allegations of the indictment against Defendant Yassine do not trigger the statutory rebuttable presumption in favor of detention. *See* 18 U.S.C. § 3142(e) and (f). While the four counts against the Defendant Yassine (i.e., Counts 1, 3, 4 and 5) all allege serious charges carrying a statutory maximum of twenty (20) years,[10] undersigned counsel's preliminary analysis of the relevant

---

[8] This building has internal security with security cameras monitoring various portions of the building. Defendant Yassine believes that building security would agree to monitor any attempt by Defendant Yassine to exit the building and immediately report to the U.S. Marshal Service if the Defendant attempted to exit the building. Undersigned counsel has attempted to contact Ms. Jelicka Long, Director of Operations for the building, but has been unable to get through to her to date.

[9] The ability of counsel to access the Defendant and to listen to the approximately 60 CD roms of recorded conversations is essential, particularly since it is undersigned counsel's understanding that some of those conversations are in foreign languages (some of which Defendant may or may not be able to understand, but none of which undersigned counsel will be able to understand). And given the protective order previously entered by the Court on April 2, 2012, *see* **DOC #63**, consultations with Defendant Yassine in the Bastrop County Jail will significantly impair and impede the factual investigation of those CD roms and the preparation and presentation of a defense since none of the materials can be left with the Defendant. Moreover, undersigned counsel's lap top computers cannot play the CD roms at a volume loud enough for undersigned counsel and Defendant Yassine to both to hear them given the fairly constant background noise that pervades the interview rooms at the Bastrop County Jail.

[10] The indictment seeks forfeiture of a total of $214,500, jointly and severally. The Government seized slightly more than $218,000 on March 22, 2012, from the Defendant's office and/or businesses. However, based on **Exhibit 19**, the Government has apparently released those funds to the Texas Comptroller's Office. *See* pages 21-22, *infra*.

Sentencing Guidelines reflects a total offense level of 28[11] with a criminal offense history level of I, which would yield a range of 78 to 98 months if there was a conviction [and before any additional adjustments and/or variances (upward or downward)].

Additionally, while the Government adduced testimony regarding the charges during the detention hearing[12] -- to the effect that there are tape recorded conversations and videotapes of the CI[13] and Defendant Yassine (and other co-defendants) discussing the CI's funds (i.e., Government funds provided to the CI) -- if in fact the tapes "play out" as Special Agent Neff believes the case to be, *see* **Exhibit 1** at pages 95-96,[14] then entrapment would be a very obvious defense given the total

---

[11] Counsel has on more than one occasion miscalculated a guideline range, but that as it may, counsel's best preliminary calculation of the situation (giving the benefit to what undersigned believes the Government would contend) is as follows:

    8       the base level under USSG § 2S1.1(a)(2);

+   12      level upward adjustment under USSG § 2S1.1(a)(2) based on the USSG § 2B1.1 table regarding the alleged $214,500 in laundered funds;

+   6       level upward adjustment under USSG § 2S1.1(b)(1)(assuming, for purposes of argument only, that the Defendant knew or believed that the funds were the proceeds of, or were intended to promote, drug trafficking, a point not conceded by counsel); and

+   2       level upward adjustment under USSG § 2S1.1(b)(2)(B).

[12] These charges, it should be noted, do not involve any of the offenses specifically identified in 18 U.S.C. § 3142(g)(1).

[13] Based on counsel's preliminary investigation (as opposed to any discovery from the Government), the CI is a disgruntled relative of the Defendant Yassine who was fired (for a multitude of reasons, including but not limited to dishonesty and theft) and who, according to Special Agent Neff at the detention hearing, "has credibility issues" and is no "pillar of society." *See* **Exhibit 1** at page 71.

[14] Special Agent Neff's testimony to the effect that Defendant Yassine wanted to pay the CI $1,000 or $2,000 a month from each of his business establishments as payment for the CI to bring him cash to "launder," *see* **Exhibit 1** at page 95, makes absolutely no sense to undersigned counsel. A "money launder" would typically charge a percentage of the cash he or she launders as the "fee"

absence of any other allegations that Defendant Yassine had ever previously or subsequently laundered money for anyone else but this particular CI.  Accordingly, this is by no means and open and shut case.  Defendant Yassine has retained undersigned counsel to represent him and intends to rigorously defend himself of charges he views as not only stale,[15]  but lacking in merit.  Certainly, the Government adduced no evidence of an ongoing conspiracy from October 2008 **to the date of the return of the indictment**, contrary to first sentence of count 1.

### B. The Magistrate's Order Regarding Risk Of Flight Is Not Supported By Sufficient Credible Evidence.

As noted above, the order of detention finds "a serious risk that the defendant will not appear," but Defendant Yassine asserts that it is not supported by a preponderance of the credible evidence **both** that the Defendant presents a risk of flight **and** that no condition or combination of conditions can be imposed reasonably to assure his required attendance, as mandated by 18 U.S.C. § 3142.

The order of detention identifies the following factors as supporting the conclusion that there is a "serious risk that the defendant will not appear":

1. The defendant is not a citizen of the United States and is not lawfully admitted for permanent residence.

---

to "clean" the money for the criminal possessing the "dirty" cash, not vice versa. Given that many of the business establishments owned by Defendant Yassine accept cash from their patrons, Special Agent Neff's testimony in this regard appears to reflect (at least to undersigned counsel) a degree of confusion regarding what the CI allegedly told him (Special Agent Neff) that the Defendant Yassine wanted to do. Of course, this could well be a function of the realization that the CI is a disgruntled relative of Defendant Yassine who was "fired" by Defendant Yassine for stealing cash from his business establishments, coupled with further realization that, as testified to by Special Agent Neff, the CI has "credibility issues" and is not a "pillar of society." *See* **Exhibit 1** at page 71.

[15] The three alleged transactions occurred on the following dates: October 10, 2008 regarding $8,500; April 30, 2009 as to $100,000; and June 24, 2009 as to $100,000.

2. The defendant is facing serious charges involving drug trafficking and substantial sums of money.

3. The defendant is a permanent resident alien with an incentive to flee as it is inconceivable immigration officials will not move to revoke his residence should [h]e be convi[c]ted of the instant charges.

4. The defendant also has significant ties to another country.

*See* **DOC #36** (emphasis added).

Each of the four above factors will be addressed in order below.

**First**, while the Defendant is not a citizen of the United States, the order of detention is incorrect because he is in fact a lawful permanent resident of the United States (who has applied for naturalization to become a citizen of the United States). *See* **Exhibit 2** (Petition in Cause No. A-11-CV-1024 LY, United States District Court, Western District of Texas)(i.e., Petition For De Novo Review Of Petitioner's Application For Naturalization Pursuant to 8 U.S.C. § 1421(c) and Request For De Novo Hearing). As reflected therein, Defendant's permanent resident alien registration number is A 94-078-003. As further reflected therein (and in the exhibits attached thereto) Defendant entered the United States in August 1989. He subsequently applied for lawful permanent resident status. *Id*. at pages 1 to 4.  Defendant Yassine was granted conditional resident status on August 24, 1994, and on August 19, 1996, the conditions were removed on Defendant's permanent resident status. For over eight years -- since December 2, 2003 -- Defendant Yassine has been in the process of attempting to become a United States citizen. The petition explains in rich detail each of those steps and the response of the INS and/or DHS (Department of Homeland Security). In fact, the petition filed by Defendant Yassine, by and through his civil counsel, reflects that Defendant Yassine was previously confronted (as early as October 19, 2009, *see* page 8, paragraph 34 to 35 of **Exhibit 2**) with allegations that he was not then current on his tax payments to the IRS for 2005 to 2008 (see

page 10, paragraph 45 of **Exhibit 2**). Yet, Defendant did not flee the United States to avoid an investigation or prosecution of any such tax charges.[16]

**Second**, the while the defendant is facing serious charges, those charges do not involve "drug trafficking." No drugs or guns were located during the March 22 searches of Defendant's office and/or his residence. *See* **Exhibit 1** at pages 99, 101. The total amount of funds allegedly laundered is $214,500, although Defendant Yassine is not indicted in connection with the $6,000 identified in count 2.

**Third**, while there may be an incentive for anyone to flee when they are facing a potential "presumptively reasonable guideline" sentence of 78 to 98 months, that incentive hardly exists for someone who has spent the past twenty plus years living in the United States, owns two residences in Austin,[17] and has been attempting to become a United States citizen since December 2003. Furthermore, Defendant Yassine could not flee even if he was released. First, his passport has been seized by the Government at the time of the search. *See* **Exhibit 1** at page 100. Second, as reflected by the affidavit of Bruce Clark of the law firm of Clark & Clark, one of Defendant Yassine's civil

---

[16] On information and belief, wire transfers made on behalf of Defendant Yassine to his mother in Lebanon, as testified to by Special Agent Neff at the detention hearing, *see* **Exhibit 1** at page 64, were reported by SWIFT to the United States government (most probably, to DHS). As the Court is aware, SWIFT is a member-owned cooperative through which the financial world conducts business operations, including wire transfers. *See* **Exhibit 3**. SWIFT cooperates with the government to track terrorist financial transfers and suspected illegal activities and on information and belief has, since shortly after September 11, 2001, been reporting all foreign wire transactions to the government for potential investigation. Indeed, undersigned counsel has personally been involved in more than one criminal case where wire transfers to a foreign country triggered and instigated a terrorism investigation of the citizen, although there was absolutely no terrorism charges ever brought because the wire transfers were merely to the citizen's family members living in foreign countries.

[17] Both of these residences and their approximate value and lien amounts are discussed below. *See* Section II(D), *infra* at page 16 *et seq*. It appears that there is no less than $500,000 worth of equity and perhaps as much as $900,000.

lawyers, Defendant Yassine is aware that he has been under investigation for years, as every time

he has flown, he has been detained/interrogated and/or escorted by federal agents. *See* **Exhibit 4**. As

reflected by Mr. Clark's affidavit (and his email to Senator Kirk Watson outlining the situation

attached to his affidavit), Mr. Clark and his firm had even drafted a lawsuit to file against the

Government due to the incessant detentions/interrogations and/or escorts, but had held off on doing

so. Nevertheless, as noted by Mr. Clark:

> When he (Defendant Yassine) travels he undergoes significant harassment at airports.
> The situation had been going on for many years. The degree of harassment he
> received varied, but usually had common components. he explained that anytime he
> flies, he must undergo extensive questioning at the airport by various levels of
> Federal Government agents. he is often delayed for extensive periods of time,
> sometimes hours. On some occasions he is also escorted on and off of airplanes by
> Federal Agents.

It is inconceivable that Defendant Yassine could physically flee given the Government's past

surveillance of him,[18] even if he currently had possession of his passport and/or identification card,[19]

as a GPS monitor would alert law enforcement to any unauthorized travel (outside of whatever

geographical limitations the Court imposed).[20]

---

[18] Special Agent Neff testified at the detention hearing that Defendant Yassine had been under surveillance "off and on" since 2009. **Exhibit 1** at page 98. Presumably, Special Agent Neff was unaware of the actions of DHS over the past years, as reported by Defendant to his counsel Mr. Clark.

[19] Consistent with the contents of footnote 16, *supra*, on information and belief, Defendant Yassine was put on a "watch list" post September 11, 2001, due to the wire transfers to his mother in Lebanon (which Special Agent Neff testified had occurred at some unspecified time in the past, *see* **Exhibit 1** at page 64). It is further believed that Defendant Yassine's permanent resident card has been seized by the Government as he currently does not have it in his possession in the Bastrop County Jail (although, it could be within his property in the custody of the Bastrop County Sheriff or the U.S. Marshal and/or FBI).

[20] And even if Defendant Yassine was inclined to and could "take off" the GPS monitor from his ankle while he was within whatever geographical limit the Court established for him (such as the 78701 zip code or his apartment), that action would in and of itself trigger an alert to law

**Fourth**, the Magistrate Judge's conclusion that "[t]he defendant also has **significant ties to another country**," needs to be reviewed in light of the entire record and the contents of this motion and the exhibits hereto. As reflected by the U.S. Pretrial Report, Defendant was born in the Ivory Coast and has lived in the United States since he shortly after he turned 17 years of age, having lived in Austin for the  past twenty-two years. His father and two brothers also reside in Austin. He has (at least at the March 22, 2012, search) nine different business establishments in Austin.  While his mother lives in Lebanon, Defendant Yassine has never lived there. He has traveled there in the past to visit his mother (which he reported to U.S. Pretrial Services), but that visit was merely for three days. The fact that his mother owns a house (apparently purchased with funds provided by the Defendant, including funds sent to his uncle, Mohamad Ismail[21]), does not mean that Defendant Yassine has **significant ties** to Lebanon or any other country. While Mr. Neff testified that "our investigations also uncovered foreign bank accounts in Lebanon and, also, in Switzerland," *see*

---

enforcement. Since the closest international border to Austin is Mexico and Defendant Yassine could not fly, even domestically, absent being intercepted at the Austin airport (absent false identification and Special Agent Neff found no indication of false identification documents or that Defendant Yassine had ever used an alias, *see* **Exhibit 1** at page 100, it is inconceivable that Defendant Yassine could flee. In fact, Special Agent Neff testified that as to Hadi Yassine, he did not see how he could flee absent false identification. *See* **Exhibit 1** at page 81.

[21] The affidavit of Mohamad Ismail, attached hereto as **Exhibit 5**, is at variance with the testimony of Special Agent Neff at the detention hearing in that he proclaims he remembers only receiving $7,500 to give to Defendant Yassine's mother and has no ties to any unsavory organization. *See and compare* **Exhibit 1** at pages 64-65 with **Exhibit 5**. In this regard, Mr. Steve Orr, counsel for Mohammad Yassine, took the position in the appeal of the detention of Mohammad Yassine (*see* page 3 of **DOC #60** in Cause No. A-12-CR-105) that Special Agent Neff *misunderstood* what Defendant Yassine's father attempted to say on the day of the search regarding Mohamad Ismail and an unsavory organization. Regardless of what Defendant Yassine's father was attempting to say, the affidavit of Mr. Mohamad Ismail, attached hereto as **Exhibit 5**, adds clarity to the situation.

**Exhibit 1** at page 90, virtually no specifics[22] were provided by Special Agent Neff (including the dates these alleged accounts were opened, the amounts of money that are allegedly within them, the identities of anyone else who might have been on any such account(s), such as other family members, and if and when they had previously been closed).[23] Even assuming that the information provided to Special Agent Neff was accurate[24] (and that Special Agent Neff was not basing his testimony upon unreliable fabrication related to him by the CI, who is a disgruntled relative of the Defendant Yassine and who, according to the Government, "has credibility issues" and is no "pillar of society"), a bank account in a foreign country does not provide that person with "**significant ties**" to another country.[25]  Given the Government's resources (and its Tax Treaty with Switzerland), it is

---

[22] The only specific fact Special Agent Neff testified regarding these accounts was that the Swiss account was opened "in approximately 2002." **Exhibit 1** at page 90.

[23] In this regard, even if there were bank accounts in Lebanon or Switzerland, that does not mean that Defendant Yassine personally opened them or that he would be aware that they are still opened. For instance, in the recent past, undersigned counsel learned from Wells Fargo Bank that an account that undersigned counsel had believed to be closed in the early 1990s (in the name of Alvis, Carrsow, Cummings, Hoeffner & Botsford, LLC, if counsel recalls correctly) still was on the computer system of Wells Fargo and contained a balance of less than $100.00 (if counsel recalls correctly, the balance was approximately $55.00).  In fact, unless counsel is mistaken, very year the Texas Comptroller publishes a list of people whose accounts have been tendered to the State by financial institutions due to long periods of inactivity and an inability of the financial institutions to have returned the funds to the depositor.

[24] Undersigned counsel is not questioning Special Agent Neff's veracity, but rather believes that the information upon which his testimony appears to be based is hearsay that may not be entirely accurate and reliable. For instance, Special Agent Neff testified at pages 89-90 that it was his "**understanding**" that Defendant Yassine "purchased a house for" his mother in Lebanon that is currently up for sale "right now" for approximately $700,000 in U.S. dollars. This does not sound like it is based on any documentary evidence, but rather on what someone, presumably the CI, told him. Regardless, the point is that the underlying basis of his testimony was not explored in any depth during the detention hearing.

[25] Undersigned counsel has no personal experience with the ability to access funds in a foreign bank account, but it is his understanding from representing individuals who have participated in various voluntary disclosure programs with the Department of Justice, Tax Division, that foreign bank accounts can be accessed by a citizen of the United States from within the United States with

beyond belief that if the Government had "hard information" (as opposed to hearsay from the CI) regarding actual foreign bank accounts, the Government could not (and has not) obtained any documentation regarding any such accounts. And had the Government obtained any such documentation on any such foreign accounts, presumably the Government would have adduced that evidence  (or at least provided the specifics) to the Magistrate Judge. The absence of such documentation and/or specifics tends to support at least an inference that Agent Neff's testimony regarding what the "investigations" had "uncovered," *see* **Exhibit 1** at page 90, was probably based upon the musings of the CI.  And while none of the counsel present at the detention hearing sought any reports prepared by (and/or reviewed by) Special Agent Neff (or other documents reviewed by Special Agent Neff in anticipation of his testimony at the detention hearing), as authorized by Rule 26.2 of the Federal Rules of Criminal Procedure,[26] undersigned counsel will be filing such a motion in an effort to get the specifics, if they exist, so that the Court may be fully and fairly apprised of the specifics. In other words, the Government painted with an exceedingly "broad brush" at the detention hearing, and undersigned counsel believes that the Court is entitled to specifics so that a full and fair picture is presented to the Court.

### C. New Information Which Has A Material Bearing On The Issue.

The Court should also be aware of the following new information that has a material bearing upon whether there exists a combination of conditions that can reasonably assure the Defendant's

---

funds being wired from the foreign bank account to a bank located within the United States. Accordingly, while a foreign bank account might indicate the availability to access funds in the United States from that foreign bank account, it hardly indicates "significant ties" to that foreign country (at least in undersigned counsel's opinion, for what little that may be worth).

[26] Undersigned counsel is not being critical of any of the counsel at the detention hearing, but rather merely observing that getting to the factual basis of Special Agent Neff's testimony probably would have painted a more accurate picture for the U.S. Magistrate Judge.

appearance and the safety of any person and the community:

**1.** Defendant Yassine has made charitable contributions to the Austin Art Cow Auction on November 13, 2011, in a total amount of $107,000. *See* **Exhibit 6**. These proceeds went to the Superhero Kids Endowment at the Dell Children's Medical Center of Central Austin. *Id.*[27] This extremely generous contribution certainly demonstrates Mr. Yassine's commitment to the community, despite his knowledge (before and after November 2011) that he was under surveillance by DHS whenever he traveled and that the Government had long since taken a position that he was not reporting all of his income (back in October 2009, as reflected above in connection with **Exhibit 2**). Clearly, the time to flee, if he was going to flee, was years ago, but he remained in the community and even made this significant charitable contribution.[28]

**2.** Two of Defendant Yassine's attorneys, Mr. Allen Hill of the law firm of Hill, DuCloux, Carnes & De La Garza, and Mr. Curtis Osterloh of the law firm of Scott, Douglas & McConnico, L.L.P., have provided letters to undersigned counsel regarding Defendant Yassine. Both have provided legal services to Mr. Yassine for over a decade. *See* **Exhibit 7** and **Exhibit 8**. Both express their opinions regarding their belief that Mr. Yassine would comply with any requirements placed on him by the Court. In undersigned counsel's opinion, it is exceedingly rare that a civil attorney would vouch for a client who had been indicted (and received extensive negative publicity).

---

[27] This should have ultimately been paid out of the account relating to Vicci, Inc., but undersigned counsel has no access to the records seized by the Government to further substantiate the payment.

[28] On information and belief, undersigned counsel believes that Defendant Yassine also made considerable charitable contributions to Austin Child Protective Services (or some similar named entity) in amounts of $10,000, $6,000, $12,000 and $8,000 in late 2011 and/or early 2012. This should have come out of the account for Walachi, Inc. However, due to the seizure of over 400 boxes of records by the IRS from Mr. Yassine's office, clubs and/or residence(s), undersigned counsel has been unable to verify the exact entity and the dates and amounts of these charitable contributions.

Obviously, Mr. Hill and Mr. Osterloh both believe Defendant Yassine would not flee if released on bond.

**3.** As reflected by the letter from Defendant Yassine's fiance, Lacy Lockwood (*see* **Exhibit 9** (which also contains six additional letters in support of Defendant Yassine), Defendant Yassine is a compassionate, caring individual who is dedicated to his family and his future life in Austin (including Lacy herself and her disabled brother: they come as a "package"). While we have all been "conned" by someone in our lives and Ms. Lockwood has only been involved with Defendant Yassine for approximately two years, she earnestly believes that Defendant Yassine will comply with any and all conditions of release. Coupled with the opinions of Mr. Hill and Mr. Osterloh, this is powerful new evidence that is  material to whether Defendant would flee and whether there are conditions that would reasonably assure his appearance.

In conclusion, given the original detention hearing and the instant appeal and evidence adduced in support thereof, it is **NOT** more likely than not that no condition or combination of conditions would reasonably assure the Defendants' appearance. Accordingly, this Court should grant this appeal/reconsideration motion and establish a combination of conditions that will "reasonably assure" his appearance, including but not limited to those outlined above at pages 4-5 of this appeal/motion.

### D. The Magistrate's Order Regarding Risk To Another Person Or The Community Is Not Supported By Sufficient Credible Evidence.

In a nutshell, there is absolutely no credible evidence -- let alone **clear and convincing evidence** -- that Defendant Yassine will endanger the safety of another person or the community. Contrary to the Magistrate's order, quoted above, the "defendant is **NOT** accused of drug related offenses, although the CI purportedly informed Defendant Yassine and his fellow co-defendants that

the cash he allegedly wanted to "launder" was connected with his (the CI's) alleged drug dealings.[29]

Moreover, the "substantial criminal conspiracy" identified by the Magistrate in the detention order is insufficient to satisfy the Government's burden of "clear and convincing evidence" that Defendant Yassine will endanger the safety of another person or the community. Perhaps that is why the Government did not seek detention on this basis in the first instance, *see* **DOC #12**, but regardless, no facts support this conclusion, particularly given the long delay since the dates of the alleged money laundering in the indictment (i.e., October 10, 2008 as to the $8,500 alleged in count 3; April 30, 2009, as to the $100,000 alleged in count 4; and June 24, 2009, as to the $100,000 alleged in count 5). The fact that Defendant Yassine was not indicted for almost 2.5 years after the last alleged illegal act is telling: he did not pose an immediate threat of flight or a danger to the safety of any other person or the community![30]

### E. The Defendant Has Real Property With Substantial Value In Austin That Supports The Conclusion That He Has Significant Ties To The Community And Would Not Flee.

As alluded to above, the Defendant owns two residences in Austin: (1) 555 W. 5th Street, Apartment 3121, Austin, Texas; and (2) 4504 Ari Court, Austin, Texas, 78741. As best undersigned counsel can ascertain, the current values and approximate mortgage balances on these properties are

---

[29] The Magistrate's use of the term "drug related offenses" may have been misinterpreted by undersigned counsel and may not have been intended to convey the impression that the offenses were actually drug offenses under Title 21 of the United States Code.

[30] This was essentially admitted to by Special Agent Neff during the detention hearing. *See* **Exhibit 1** at page 102. Furthermore, Special Agent Neff's delineation of other investigations against Defendant Yassine is quite unpersuasive. Defendant Yassine has no knowledge of being a person of interest by the APD cold case squad, but even if he was, one of undersigned counsel's prior clients (who was a "person of interest" in a different cold case investigation) actually testified for the State of Texas in the prosecution of the person ultimately indicted for that homicide. The point being that merely because someone is a person of interest does not create a risk of flight or a risk of danger to the community.

as follows:

> 555 W. 5th, Apt. 3121: Current tax appraised value of $1,249,378; promissory note at date of acquisition on May 13, 2010 of $910,000; estimated actual value of between $1,500,000 and $1,800,00 (based on comparables); estimated equity of no less than $318,884 and perhaps as much as $500,000 to $900,000. *See* **Exhibit 10**.[31]

> 4504 Ari Court: Current tax appraised value of $183,947; estimated value of $250,000; estimated balance on loan of $80,000; estimated equity of approximately $170,000. *See* **Exhibit 11**.[32]

---

[31] The promissory note of May 13, 2010 is for an $918,000, but undersigned counsel does not know the amount of the principle reductions from payments made on that note since its execution. Additionally, documentation cannot be obtained from the note holder due to the Defendant's incarceration. Regardless, the assessed value is from the Travis CAD and that document shows a total square footage on the first floor of 3,142 square feet. There is also a partial second story, which appears to contain an additional 499 square feet (a total of 3,641 square feet, although this conclusion is not entirely clear from the Travis CAD documentation).

Three comparables are current real estate listings of units in the same building. They reflect the following asking prices and square footages: (1) a one bedroom on the 5th floor consisting of 1,263 square feet for $389,000 ($308 per square foot); (2) a 3 bedroom on the 30th floor consisting of 5,055 square feet for $2,550,000 ($504.45 per square foot); and (3) a 3 bedroom on the 31st floor consisting of 4,183 square feet for $1,799,500 ($430.19 per square foot).

At $430 a square foot for space on the 31st floor -- the same floor that Defendant Yassine's apartment is located on -- Defendant Yassine's apartment would be worth $1,351,657 if it were only 3142 square feet, but if it is actually 3,641 square feet, it would be worth $1,566,321. At $504 per square foot (based on space on the 30th floor), Defendant Yassine's apartment would be worth between $1,583,568 (at 3142 square feet) and $1,835,064 (at 3,641 square feet).

Regardless of the estimated value, the minimum equity is still $318,884 (i.e., the differential between the original note amount of $918,000 and the Travis County CAD appraised value of $1,236,884, which contradicts Special Agent Neff's testimony at page 92 of **Exhibit 1** that there was no equity in any of the properties owned by Defendant Yassine. And, given the above, the actual equity in the property may been as much as $500,000 to $900,000.

[32] It has been impossible for undersigned counsel to obtain documentation regarding the current loan amount due to Defendant's detention. Also, ascertaining comparable values is certainly more "speculative" than the comparables provided in **Exhibit 10** since undersigned counsel has not found properties listed for sale on the same street, etc.

Additionally, it should be noted that Defendant Yassine's civil counsel is in the process of listing this property for sale in order to raise funds for the defense, but since this property is no

Defendant Yassine also owns a lot at 7502 Bar K Ranch Road (Lago Vista), which is tax appraised at $8,000 and which is believed to be owned free and clear. *See* **Exhibit 12**.[33]

Additionally, based on **Exhibit 13**, Defendant Yassine has been a "dream tenant" and has invested more than $1.0 million dollars into improvements into properties that he rents from one landlord. Some of the leases for the businesses are, as in that case, for long terms at favorable (to the current market) rates that contain significant value to the Defendant Yassine if he can be released and get his businesses back up and running[34] or otherwise sublease the physical locations to other potential tenants.

Additionally, while a figure is not readily available, there is also significant value in the furniture and fixtures associated with his businesses, as alluded to by Special Agent Neff at page 93 of **Exhibit 1**.

To think that Defendant Yassine, who has spent the past 22 years living in Austin and building a successful business enterprise (while continuously attempting for the past 8 plus years to become an American citizen) would leave everything that he has built and flee if released on conditions (including a GPS monitor) is simply beyond belief, particularly given the absence of a

---

longer Defendant Yassine's "homestead," it could also be used as security for a bond should the Court grant a bond.

[33] Again, no documentation other than the Travis CAD appraisal could be located.

[34] Quite candidly, the Government's actions in trying to "shut down" Yassine's businesses is counter-productive (and counter-intuitive), particularly since the Government believes he owes substantial back taxes, as the operations of those businesses could be used to generate income to pay those purported back taxes. It should also be noted that Mr. Allen Hill has informed undersigned counsel that Defendant Yassine recently rejected an offer of $1.9 million dollars to sell one of his businesses -- the club known as Roial -- because it was a successful, ongoing business. Whether that club has any real value given the fact that the TABC shut it down remains to be seen, but the point remains that given Defendant's knowledge that he was under investigation, his decision not to sell the club further demonstrates his intention to remain in the Austin community.

passport and/or any type of identification.

**F. The Defendant's Business Accounts Have All Been Frozen By The Texas Comptroller's Office.**

On March 22, 2012, the Texas Comptroller served freeze notices upon three of the Defendant's business accounts (and, as noted by Special Agent Neff, Defendant Yassine has no personal bank accounts[35]). The amounts of those freeze notices were as follows:

```
Warehouse Entertainment LLC:     $420,860.31;
Walachi, Inc.:                   $186,205.78;
Vicci, Inc.:                     $458,723.94
```

*See* **Exhibit 14**.

On March 29, 2012, the Texas Comptroller served additional freeze notices upon six of the Defendant's business accounts and on Defendant Yassine (individually). The amounts of those freeze notices were as follows:

```
Island Of Treasure, LLC:          $41,337.02
Pure Austin Nightclub LLC:        $558,016.29
The Downtown Austin Group, LLC:   $88,729.62
Acoustic Cafe, LLC:               $276,608.17
607 LLC:                          $126,671.72
Austin Sixth Street, Inc.:        $85,280.02
Hussein A. Yassine:               $81,151.91
```

*See* **Exhibit 15**.

On April 9, 2012, after Defendant Yassine attempted to access (via his manager, John Webb, and one of his civil counsel, Allen Hill) one of his business accounts where a previous freeze had already been fully paid to the Comptroller, the Comptroller served additional freeze notices upon six of the Defendant's business accounts (including the one alluded to above where the prior freeze had been paid in full and thus, the additional funds in that account were legally available to Defendant Yassine). The amounts of those freeze notices were as follows:

---

[35] *See* **Exhibit 1** at page 92.

```
607 LLC:                      $2,480,929.72
Walachi Inc:                  $2,480,929.72
Warehouse Entertainment LLC:  $2,480,929.72
Acoustic Cafe LLC:            $2,480,929.72
Pure Austin Nightclub LLC:    $2,480,929.72
Vicci Inc:                    $2,480,929.72
```

*See* **Exhibit 16**.

And then, as if all of the above freeze notices (none of which contained any supporting documentation to substantiate the amounts of the freezes) were not sufficient to drain every penny out of Defendant's business accounts, two additional notices of tax due were issued by the Comptroller as follows:

```
Yassine Enterprises LLC:   $630,690.04 (limited sales,
                           excise and use tax)
Yassine Enterprises LLC:   $1,850,239.68 (mixed beverage
                           gross receipts tax)
```

*See* **Exhibit 17**. What is most "telling" about these two notices is the undisputed fact that the $1,850,239.68 for mixed beverage taxes due by Yassine Enterprises is 100% unjustified, as Yassine Enterprises LLC has no liquor permits whatsoever. Absent liquor permits, there cannot be a mixed beverage gross receipts tax and the Comptroller's Office obviously has this wrong. However, this egregious error made by some overzealous person at the Comptroller's Office cannot be rectified until the administrative appeal process forces the correction.

Indeed, on information and belief, the IRS has supplied the Comptroller with information prompting these freezes and orchestrating the seizure and freezing of all of Defendant's business bank accounts. While the intent may not have been to deprive Defendant Yassine of funds necessary to defend himself, the freezes have certainly stripped him of assets which could have (potentially) been used to flee the country (had he had any such intent) or post a large cash deposit bond (which he would have otherwise been happy to do).

More importantly, as reflected by the exhibits to **Exhibit 2** (the naturalization petition),

Defendant Yassine was clear on all taxes (state and federal) through October 2010. *See also* **Exhibit 18** (letters from the Comptroller's Office as of September 2010 and October 2010 indicating compliance, certain administrative appeals, and a "thank you" letter to Defendant Yassine from the Comptroller's Office for "the good manner in which you complied with the agreement," i.e., a payment agreement stemming out of a previous audit). Prior to March 22, 2012, the TABC did periodically audit the various entities, but never before had the TABC/Comptroller's Office issued jeopardy assessments or froze Defendant Yassine's business accounts and all such audits were resolved amicably or through administrative appeals. Since the freezes were issued on the same day that the arrest warrants were executed, Defendant Yassine cannot help but believe that these were coordinated efforts based upon Special Agent Neff's belief that the gross receipts of the business entities had been under reported.[36]

The entire point of the foregoing, however, is that Defendant intends to fight these freezes and seizures and does not intend to walk away from the funds seized from his business accounts (the exact amount of which is unknown due to the absence of any documentation available from TABC and/or the Comptroller's Office). It should also be noted that pursuant to the execution of the search

---

[36] Special Agent Neff testified that he had a **"rough estimate"** that the "gross receipts" of Defendant Yassine's businesses had been under reported "over the past five years or from 2005 to 2010 in excess of $7 million." *See* **Exhibit 1** at page 92. Special Agent Neff did not testify regarding the basis for his **"rough estimate."** Special Agent Neff did testify that he had found altered Aloha system spreadsheets which matched up to the amount that they were reporting to TABC and the comptroller's office. *See* **Exhibit 1** at page 94. It would be reasonable to conclude that Special Agent Neff may be extrapolating from those altered Aloha spreadsheets as the basis of his **"rough estimate."** Of course, Special Agent Neff did not testify where these altered Aloha spreadsheets were found, which business or businesses they related to, the time frame of those documents etc., and essentially offered no further details, let alone information that would support the conclusion that Defendant Yassine (who employed between 150 and 200 people in his businesses) was personally aware of and/or orchestrated these altered Aloha spreadsheets (as opposed to employees and/or former employees who might have been stealing from the various businesses, including but not limited to the CI).

warrants on March 22, 2012, there was approximately $218,000 in cash seized from the Defendant's office safe and/or businesses. *See also* **Exhibit 1** at page 95. Despite Mr. Sheppard's request to Mr. Sofer that the Government return of that cash to him (Mr. Sheppard), the cash was transferred to the Comptroller's Office after the date of Mr. Sheppard's request because the Comptroller's Office subsequently served a notice of levy upon the IRS. *See* **Exhibit 19** (email correspondence between Mr. Sheppard and Mr. Sofer).

Additionally, despite Defendant's belief that there has been a concerted effort by and between the United States and the State of Texas to strip him of his assets and prevent him from accessing funds necessary to defend himself, Defendant Yassine does not intend to walk away from the life he has built the past 22 plus years. Instead, Defendant Yassine intends to vindicate himself of the indictment allegations and recover the funds seized by the TABC/Comptroller's Office through the administrative appeal process and/or civil lawsuits. Indeed, although the administrative hearings on the freezes are not going to occur in the near future, he fully expects to be able to demonstrate that there is no factual basis for the huge freezes and seizures and further demonstrate that there has been complicity between the Comptroller's Office and Bank of America in refusing to release funds from his business account (after the only freeze notice as to that one account had been paid by the bank in its entirety).

### G. The Defendant's Tax Returns Demonstrate Past Substantial Income And Support The Conclusion That He Would Not Flee.

Defendant's federal income tax returns for past few years, all of which were prepared by Mr. Curtis Osterloh with information provided to him by and/or through Defendant Yassine, are germane

to the situation.[37] Those tax returns reflect significant gross receipts and significant income and will be tendered to the Court for the Court's consideration.[38] Gross receipts for the various business entities by year for the past five years (to the extent that they were in existence) is as follows:

| Entity | 2010 | 2009 | 2008 | 2007 | 2006 |
|---|---|---|---|---|---|
| Warehouse Entertainment | 730,550 | 802,039 | 768,528 | 341,000 | |
| Yassine Enterprises LLC | 30,766 | | | | |
| Malaia[39] | | 792,054 | 762,720 | 312,634 | |
| 607LLC dba Fuel | 564,866 | 561,108 | 562,453 | 481,065 | 486,286 |
| Acoustic Cafe LLC dba Spill | 564,185 | 621,211 | 785,561 | 912,087 | 880,025 |
| Kiss & Fly[40] | 870,214 | 819,201 | 745,132 | 793,738 | 1,179,036 |
| Island of Treasure LLC dba Treasure Island | 614,961 | 567,624 | 520,312 | 620,601 | 558,901 |
| Pure Austin Nightclub dba Pure Ultra Lounge | 939,982 | 725,607 | | | |

Defendant Yassine's adjusted gross income for these same years was as follows:

2010: $563,210
2009: $393,609
2008: $311,822
2007: $214,350
2006: $263,348

---

[37] Defendant Yassine's 2011 Form 1040 has not yet been filed and given the seizure of over 400 boxes of documents on March 22, 2011, it is unknown when documentation necessary to the preparation and filing of the 2011 return will be obtained.

[38] Due to volume of redactions and the sheer number of pages, they are not being attached hereto as Exhibits due to the fact that once they are scanned, the size of the electronic files will be too large to file with all of the other electronic files attached hereto as exhibits.

[39] This is actually Walachi, Inc, dba Malaia.

[40] This is Vicci, Inc., dba Kiss and Fly.

Also, Special Agent Neff testified that Defendant Yassine had used his address at 4504 Ari Court for his past federal tax returns and that he (Special Agent Neff) felt this was an inaccurate statement by Defendant Yassine. *See* **Exhibit 1** at page 92. As reflected by **Exhibit 10**, Defendant Yassine purchased his current residence at 555 W. 5th Street, Apartment 3121 in May 2010. Defendant Yassine's 2010 Form 1040, signed by Curtis Osterloh and Defendant Yassine on or about October 17, 2010, used his office address on the Form 1040 (i.e., 213 W. 4th Street, Austin, Texas, 78701): it did not use his address as 4504 Ari Court as had his previous Form 1040's. While Defendant Yassine could have used his new residence on his 2010 Form 1040, utilization of his business address is not inappropriate, but more importantly, contrary to Special Agent Neff's testimony, he did not use the Ari Court address on the only Form 1040 filed after the date that he purchased 555 W. 5th Street.[41]

### III.

### CONCLUSION

Based on the foregoing, Defendant Yassine respectfully asserts that the March 27, 2012, order of detention should be reviewed by this Court either as an appeal and/or as a motion to reconsider. The order of detention finding "a serious risk of flight" is not based upon a preponderance of the credible evidence **both** that the Defendant presents a risk of flight **and** that no condition or combination of conditions can be imposed reasonably to assure his required attendance, as mandated by 18 U.S.C. § 3142. Indeed, given that Bernie Madoff was released on bond despite having access to family and friends with millions in the way of resources, so too can Defendant

---

[41] Agent Neff's further observation that Defendant Yassine had previously claimed to have been a U.S. citizen on documents, **Exhibit 1** at page 92, was also asserted by the Government in connection with the exhibits attached to **Exhibit 2** (the naturalization petition). However, as reflected therein, no such documents were produced in that proceeding.

Yassine. Furthermore, the order of detention finding "a serious risk that the defendant will endanger the safety of another person or the community" is not supported by clear and convincing evidence, let alone sufficient evidence to demonstrate that no condition or combination of conditions can be imposed reasonably to assure the safety of other persons or the community, as mandated by 18 U.S.C. § 3142(f). Finally, given the factors mandated by 18 U.S.C. § 3142(g)(1-4) and the new, material information presented herein, this Court should find that a combination of conditions can reasonably assure the Defendant's appearance and the safety of the community.

WHEREFORE, PREMISES CONSIDERED, Defendant respectfully prays that the Court hold a hearing on his appeal and/or motion for reconsideration and vacate the order of detention previously entered in this case.

Respectfully submitted,

/s/DAVID L. BOTSFORD
State Bar No. 02687950
1307 West Avenue
Austin, Texas  78701
512/479-8030 (Tel)
512/479-8040 (Fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was emailed to Mr. Greg Sofer, counsel for the Government via the ECF system upon the filing of same on the date it was filed.

/s/DAVID L. BOTSFORD

## LIST OF EXHIBITS

**DESCRIPTION OF EXHIBIT**                                                      **TAB #**

Transcription of March 27, 2012 Detention Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Petition For De Novo Review Of Petitioner's Application
For Naturalization In Cause No. 1:11-cv-01024-LY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SWIFT Documents From The Internet  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Affidavit Of Bruce Clark And Attached
E-Mail To Senator Kirk Watson  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Affidavit of Mohamad Ismail  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Charitable Donations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Letter From Mr. Allen Hill  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Letter From Mr. Curtis Osterloh  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Letters In Support Of Defendant Yassine  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Documents Regarding 555 W. 5th Street . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Documents Regarding 4504 Ari Court  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Document Regarding 7502 Bar K Ranch Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Internet Article Re: Yassine Being A "Dream Tenant" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Freezes by Comptroller's Office dated March 22, 2012  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Freezes by Comptroller's Office dated March 29, 2012  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Freezes by Comptroller's Office dated April 9, 2012  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Freezes by Comptroller's Office dated April 11, 2012  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Letters from the Comptroller's Office dated
September 2010 and October 2010  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Email Correspondence Between Mr. Sheppard & Mr. Sofer . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA          §
                                  §
VS.                               §          NO. A-12-CR-105-SS
                                  §
HUSSEIN ALI YASSINE               §

## ORDER

Came on for consideration Defendant's Appeal From Detention Order And/Or Motion For Reconsideration Of Detention Order. The Court, having considered the motion, is of the opinion that a hearing should be held.

It is therefore ORDERED that a hearing will be held on the _____ day of April 2012, at _____.

SIGNED this _____ day of April 2012.

_____
UNITED STATES DISTRICT JUDGE